Walter M. Rayner was employed by W. Horace Williams Company, a partnership, as a carpenter in the construction of Camp Claiborne, near Alexandria, Louisiana. His wages were agreed upon at $8 per day. While engaged in said employment and in the course and scope of his employment, he was involved in an accident. Rayner has brought this suit against his employer and its compensation insurer, Employers' Liability Assurance Corporation, Ltd., to recover compensation at the rate of $20 per week for a period not to exceed 400 weeks. He contends that the injuries received in the accident have rendered him totally and permanently disabled to do work of any reasonable character.
There is no controversy over the employment, rate of pay or that the accident occurred as claimed by plaintiff. All three are established without any contradiction from defendants. There is little if any controversy over the present disability of plaintiff. Anyway, the record shows clearly that plaintiff is totally disabled from performing any manual labor *Page 316 
or from following the only other trade he knows, aside from carpentry, that of a photographer. Plaintiff tried to follow the latter trade since the accident and was discharged because he was physically unable to do the work.
The principal defense, and the only defense that could be considered serious, is that plaintiff's present condition was not caused by the accident; that the only injury to him caused by the accident was of a minor nature and from which he fully recovered. The accident occurred as follows:
Plaintiff, together with some forty other employees, was being transported by their employer in a bob-tail truck from one place to another on the works. As was customary, the employees were standing in the truck and when it came to a curve in the road, the weight of the men was shifted to one side of the truck, causing the side boards to give way and a number of the men were thrown out onto the ground. Plaintiff fell on his stomach, face down, and one of his fellow employees, weighing approximately 175 pounds, fell on him, his knee striking plaintiff in the lower part of his back. He testified that his weight was on his knee and that when it struck plaintiff he grunted or groaned. Plaintiff was assisted to his feet and into the cab of the truck. The truck then continued on to its destination. From there plaintiff went to his home in another truck or bus and early the next morning reported to the first aid headquarters of his employer where the doctor in charge examined and treated him during that day. Immediately after the accident and the next morning plaintiff complained of his back and knee and head. His knee was badly swollen when he reported to the company's doctor the morning after the accident. Plaintiff was given medicine to relieve his pain and an infra-red lamp was used on both his knee and back. Before leaving that afternoon his back was strapped with tape. Plaintiff reported to the company's doctor the following morning, was again treated, and continued this for two more days.
Plaintiff returned to his work the second day after the accident and remained on the job for several days when he was discharged along with two other employees. Just what kind of work, if any, plaintiff performed during these few days is not shown by the record. He intimated that he merely drew pay and did nothing as many others on the job did.
The day plaintiff was discharged he went again to the first aid headquarters and was given a lot of pills by the doctor and was told to go to his home in Shreveport and rest, and report back to him several weeks later. He went to his home in Shreveport and the following day consulted his family physician. After receiving his diagnosis, plaintiff consulted his lawyer who sent him to another doctor who examined him, removed the tape from his back and placed new tape on. This doctor, who had suffered from a broken vertebra in his back, recommended that plaintiff wear a steel brace, known as a "King's Brace" and placed an order for him for such a brace. Plaintiff has worn this brace ever since.
Defendants then requested that plaintiff go to Alexandria for examination by their doctor. He went and many x-ray plates were made of his back there, as well as other examinations. He was then sent by defendants to New Orleans to be examined by another doctor of their choosing. Plaintiff went and while there entered the Charity Hospital where he remained for thirteen days and again many x-rays were made there. The entire record of twenty-three pages from the Charity Hospital has been filed in evidence. On plaintiff's return from New Orleans he went to Monroe for an examination by a doctor there and many more x-ray plates were made. He also had himself examined by a doctor in Colfax, Louisiana, and some more x-rays made by a specialist in Shreveport.
It is unnecessary for us to say that the medical men whom plaintiff consulted himself all testified in his favor and the ones he was sent to by the defendants all testified against him. It is reasonable to suppose they would not have been used as witnesses if they would have testified differently. The experts who testified for plaintiff, in reading the x-rays, looked at the plates in the shadow box in the Court Room and pointed out a fracture of the fifth lumbar vertebra. One of them said it was as plain as if looking at a broken hoe handle. And the experts used by defendants looked at the same plates and scoffed at the idea that they showed a fracture of any kind. One of the experts for the defense made a claim that he was the only doctor present capable of reading *Page 317 
the plates and the reason the plaintiff's experts could see a fracture was because they did not know a fracture from a dark line.
The medical men also disagreed as to whether there were blood cells in the ends of the bones at a joint. They also disagreed as to kinds and causes of arthritis.
We are asked by the defense to find that their medical men are more competent than those offered by plaintiff and therefore to disregard plaintiff's medical testimony. If we had the temerity to think we were qualified to do that we could not, for the testimony showing the training and experience of each of them would not justify us in so doing.
It is, to our minds, a deplorable situation which now exists in the medical profession, which ranks among the highest of professions. This is not just one case out of many, to the contrary, we are faced with the same situation in every contested suit for compensation. We have no just reason to question the integrity of the men who stand high in their chosen profession and are forced, as we have stated before, to blame the totally irreconcilable testimony from the medical men upon the imperfections of the science of medicine. Fortunately, in this case, as in most others, there are physical facts and lay testimony by which we can arrive at a just decision.
Plaintiff is a man sixty years of age and, so far as he knew, was in good health and did not suffer from his back or leg at any time before this accident. Since the accident he has suffered continually with his back and from excruciating pain in his leg — not the leg which was injured in the accident. His condition has gradually grown worse until it has totally incapacitated him from following either of the two trades he knows. He has a wife and five children and was able, before being injured, to earn as much as $56 per week. The work he was performing when injured required him to stoop, bend and handle heavy objects. He did these things without pain or discomfort; and that he received a severe blow in the lower part of the back cannot be doubted.
The Hospital record and most all the doctors admit that the sacrum is tilted forward to an excessive degree. The defense experts admit that there is a lack of union between the postero-spinous processes of the fifth lumbar vertebra. That the left side of the symphysis pubis slopes somewhat to the left and the left side of the symphysis pubis was more narrow than the right and the left side of the symphysis pubis had an indentation in the end of the bone that does not occur on the right. That he had a lordosis of the spine. But they contend all these abnormalities are congenital and not caused by trauma, although they could be so caused. Nearly all of the doctors admit that there is a dip in the back over the fifth lumbar vertebra. Plaintiff's doctors contend this clearly indicates a fracture or dislocation of that vertebra or the sacrum. Defendants' doctors say it is congenital; that often women, and negroes especially, are found with this same defect. However, plaintiff is neither a woman nor a negro. He is a white man.
It is reasonable to assume that if the abnormalities in plaintiff's back are congenital, his back would be more susceptible to injury from the blow he received than a normal back, and whether these abnormalities were caused by the blow he received or not, we think it is clearly established that the blow caused his disability. There is no claim or contention that plaintiff is a malingerer. He is a disabled man and has been since soon after the accident. He was not disabled before the accident.
It is defendants' contention that plaintiff's disability is caused by hypertrophic arthritis which was not caused by trauma, but it is shown that even arthritis not caused by trauma can be greatly aggravated by trauma.
We are not able to say just what plaintiff's injuries consisted of, due to the conflicting medical testimony, but it is definite and certain that his back is the trouble spot and has been ever since he received the blow in the accident on January 8, 1941, and the injury to his back has disabled him from following either of his two trades. He is entitled to compensation at the rate of $20 per week for a period not to exceed 400 weeks.
It therefore follows that the judgment of the lower court rejecting plaintiff's demands is reversed and there is now judgment for plaintiff against defendants, in solido, in the sum of $20 per week for a period not to exceed 400 weeks, beginning January 8, 1941, with legal interest on each payment from due date until paid. *Page 318 
The lower court correctly fixed the expert witnesses' fees of the doctors who testified in the case and the judgment in that respect, which is not complained of here, is affirmed; defendants to pay all costs.
TALIAFERRO and HAMITER, JJ., concur.